UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**DARIUS ROBERTSON,**<br><br>Defendant. | Crim. Case No. 24-CR-520-2 |

### UNITED STATES' MEMORANDUM IN AID OF SENTENCING

While the defendant, Darius Robertson, was awaiting trial for murder, he was conspiring with fellow detainees, correctional officers, and civilians outside the jail to smuggle a knife, dangerous drugs including Fentanyl, and cellular phones into the Central Detention Facility. An audit of the D.C. Jail during the period of Mr. Robertson's offense found the rate of overdose deaths at the facilities to be 10 times the national average at U.S. jails. Ex. 1. During the audit period, there were also 76 incidents of contraband drugs recovered and Narcan was administered 148 times. *Id*. These numbers are shocking and underscore the seriousness of Mr. Robertson's actions. Given his criminal history and the seriousness of this offense, and in consideration of the factors set forth in 18 U.S.C. § 3553(a), the Court should sentence him to 46 months incarceration to run consecutively to the sentence he receives in D.C. Superior Court.

**I.    Background**

From December 17, 2021, through the period of the instant offense, Mr. Robertson was incarcerated in the Central Detention Facility ("CDF") of the D.C. Department of Corrections ("DOC") awaiting trial for Second Degree Murder in D.C. Superior Court case 2021-CF1-7205. During the relevant period, Mr. Robertson was incarcerated in either the Northwest-1("NW-1") or Southwest-1 ("SW-1") housing units, which are maximum security units at CDF. During this

period, Mr. Robertson was housed with other detainees from the Clay Terrace neighborhood of Washington D.C., to include Marcel Vines and Stefon Freshley (collectively with Mr. Robertson, the "Clay Terrace Detainees").

Beginning by at least February 18, 2024—but likely much earlier—the Clay Terrace Detainees sought to bring dangerous contraband including weapons and controlled substances into CDF. They recruited Correctional Officer Rashaad Roper and Kiya Holland—a close confidant of Mr. Robertson—to assist in bringing the contraband into the jail. On February 18, 2024, Mr. Robertson made a recorded jail call to Ms. Holland. The following conversation ensued:

> **ROBERTSON**: You on your way?
>
> **HOLLAND**: Yea, I'm about to leave out the house….too much…this is too much. Like this some greedy [expletives] right here.
>
> **ROBERTSON**: I mean but it's two bowls though baby.
>
> **HOLLAND**: It don't matter it's just that [Individual-1's] joint is like big as [expletive], like c'mon now what the [expletive].
>
> **ROBERTSON**: I know baby.
>
> **HOLLAND**: I's some greedy [expletive].
>
> **ROBERTSON**: Yea…as long as it get through though baby.
>
> **ROBERTSON**: You still remember them people don't you?
>
> **HOLLAND**: What?
>
> **ROBERTSON**: I said you still remember them people don't you?
>
> **HOLLAND**: No.
>
> **ROBERTSON**: Roper.
>
> **HOLLAND**: Aight.

Shortly thereafter, Ms. Holland left a bag containing two Tupperware containers filled with contraband on a table at the staff entrance to CDF. About an hour later, Officer Roper went to the staff entrance and grabbed the bag left by Ms. Holland. Officer Roper took the Tupperware containers through the security screening room. Officer Roper placed the bag through the x-ray machine but there was no correctional officer monitoring the screen as the bag passed through. Officer Roper took the two Tupperware containers to the employee locker room, where he left them for the night.

The next day, on February 19, 2024, Officer Roper went to his locker and transferred the contraband from the Tupperware to a white Styrofoam food container. He then brought the container into NW-1 and set the container on a pushcart with two large yellow and red coolers on it inside an empty hallway. Minutes later, the Clay Terrace Detainees entered the hallway, and Mr. Vines took possession of the container containing the contraband.

 



Mr. Vines then brought the food container into his jail cell, followed by Mr. Robertson and Mr. Freshley.

Officer Roper did not return to work until February 26, 2024. That day, Officer Roper returned to the employee locker room. He retrieved the other Tupperware container and transferred contraband from that container into another white disposable food container. He then met with Mr. Vines inside a room near the NW-1 correctional officer security post.

Mr. Vines took the disposable food container containing contraband and walked with it into his assigned cell. Within seconds, Mr. Robertson entered Mr. Vines's cell. Mr. Robertson stayed with Mr. Vines for a few minutes, exited the cell, then met with Officer Roper, who escorted Mr. Robertson to a visiting room on the second floor. Waiting inside the room were two other detainees from the NW-3 housing unit. Mr. Robertson had no scheduled visit and no valid reason to be in the visitation room. Once Mr. Robertson left the visitation room, he walked unescorted with the two NW-3 detainees. While one of the detainees waited to enter NW-3, he can be seen on surveillance footage appearing to adjust something in his pants—presumably contraband given to him by Mr. Robertson.

On February 28, 2024, at approximately 10:56 a.m., Ms. Holland returned to CDF with

another bag containing two Tupperware containers. She left the bag on the same table for Officer Roper. However, before Officer Roper could retrieve the containers for the Clay Terrace Detainees, the bag was intercepted by DOC Office of Investigative Services. Collectively, the containers contained: (1) one switchblade knife; (2) one Apple iPhone; (3) a white USB iPhone charger; (4) two pairs of eyeglasses; (5) a bundle of marijuana wrapped in clear saranwrap; (6) tobacco wrapped in clear saranwrap; (7) several sheets of white rolling papers; (8) a pair of gambling dice; (9) three white sheets of bonded paper that were damp and contained MDMB-4en-PINACA—a Schedule I Controlled Substance,; (10) two saran-wrapped packages of marijuana; and (11) five individually wrapped packages in clear saranwrap containing approximately 100 cigarettes. Officer Roper was placed on administrative leave.

With Officer Roper out of the unit and on administrative leave, Mr. Robertson and the other Clay Terrace Detainees sought to recruit a new officer to smuggle contraband into CDF. Four months later, they found their man in Officer Bryan Kinard. On June 30, 2024, July 7, 2024, and July 21, 2024, Officer Kinard obtained Tupperware containers filled with food from Ms. Holland or LaTara Brown outside the jail and brought them to Stefon Freshley inside CDF. Concealed inside the food was contraband. Each incident was captured on surveillance footage. Before each of these incidents, Mr. Robertson spoke to either Ms. Holland or Ms. Brown via a recorded jail call to arrange the provision of the contraband. The July 21st incident was captured on Officer Kinard's body-worn camera. Officer Kinard can be seen on the July 21st video with audio: (1) describing to Mr. Robertson in detail the exact location of his vehicle Detainees so that their associate outside the jail could drop the contraband in Officer Kinard's vehicle; (2) providing his license plate number to the Clay Terrace Detainees so that their associate outside the jail could drop the contraband in Officer Kinard's vehicle; (3) coordinating with the Clay Terrace Detainees,

including Mr. Robertson, as to when they would like him to take his break and obtain the contraband from his vehicle; and (4) providing the contraband to Mr. Vines and then Mr. Freshley and describing the "heavy" weight of the Tupperware container.

Two days after the July 21st smuggling incident, two photographs were posted from Mr. Freshley's known Instagram account, "___steflover" despite the fact that he was detained at CDF.[1] The first photograph was a picture of Mr. Vines and his co-defendant in the courtroom during jury selection of their murder trial before Judge Friedrich that had begun days earlier. The second photograph was a black screen overlayed with text, stating "It ain't going to be safe telling on them Boyz [emojis]."



That post prompted significant new security measures at the courthouse. Additionally, it prompted law enforcement to review surveillance footage from the jail and eventually to identify Officer Kinard as the individual smuggling items in on behalf of the Clay Terrace Detainees.

---

[1] Of note, the profile picture for the "___steflover" account is a photograph of Freshley and Vines, which appears to have been taken inside the D.C. jail.

On July 25, 2024, DOC conducted two searches of the Clay Terrace Detainee's unit for contraband. Inside NW-1, DOC staff found, among other things, approximately: (1) 269 blue pills (including 120 from Mr. Vines' cell), which tested positive for fentanyl; (2) 60 cigarettes soaked in an unknown liquid (including 40 in Mr. Vines' cell); (3) 255 suboxone strips (170 in Mr. Vines' cell); (4) 7 pieces of paper soaked in an unknown liquid substance; (5) three cellular phones; and (6) cigarettes.

## II.   Sentencing Guidelines

The parties agree that the following guidelines apply.

| | |
|---|---|
| U.S.S.G. § 2D1.1(a)(5) (Cross-Reference from 2P1.2(c)) – Base Offense – 8 to 16 grams of Fentanyl | 16 |
| U.S.S.G. § 2D1.1(b)(4) Object of offense – distribution of a controlled substance in a prison | 2 |
| Acceptance of Responsibility | -3 |
| Total | 15 |

The defendant has 10 Criminal History Points and is in Criminal History Category V based on the following criminal convictions:

| Charge/Court | Disposition Date and Sentence | U.S.S.G. § | Criminal History Pts. |
|---|---|---|---|
| Voluntary Manslaughter | 6/6/2025 – plead guilty | 4A1.1(c), 4A1.2(a)(4) | 1 |
| PWID-PCP/FIP – DCSC – 2017-CF2-13462 | 12/11/2017 – 18 months | 4A1.1(a) | 3 |
| Att PWID-PCP – DCSC – 2015-CF2-9407 | 12/18/2015 – 7 months | 4A1.1(b) | 2 |
| PWID/PCP – DCSC – 2011-CF2-17436 | 5/3/2012 – 18 months | 4A1.1(a) | 3 |
| Under sentence when committed offence | | 4A1.1(d) | 1 |
| | | | 10 |

Accordingly, Robertson's Criminal History Category is to be V (the "Estimated Criminal History Category").

Based upon the Offense Level and the Criminal History Category set forth above, Robertson's Sentencing Guidelines range is 37 months to 46 months. In addition, the parties agree that pursuant to U.S.S.G. § 5E1.2, should the Court impose a fine, at Guidelines level 15, the applicable fine range is $7,500 to $75,000.

### III.   The 18 U.S.C. § 3553(a) Factors

The Court must impose a sentence that is sufficient but not greater than necessary to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational treatment. 18 U.S.C. § 3553(a)(2). The Court also must consider the history and characteristics of the defendant, the kinds of sentences available, the sentencing range under the guidelines, any relevant policy statements, and the need to avoid unwarranted sentencing disparities. 18 U.S.C. § 3553(a)(1)-(6).

Due to the severity of Robertson's criminal history and convictions, as well as the seriousness of smuggling weapons, fentanyl, and cellular devices used to obstruct justice into the jail, the government believes that the factors support the court issuing a sentence at the top of the sentencing guidelines to run consecutively with his other criminal sentences.

### A.   The Nature and Circumstances of the Offense and the Need for the Sentence to Reflect the Seriousness of the Offense

Mr. Robertson's offense was undoubtedly serious. Bringing controlled substances into an environment with a high population of individuals with substance-abuse problems can have devastating effects. Additionally, while the phones smuggled into the jail may appear relatively

innocuous, in this case, they were anything but. The evidence in this case suggests that Mr. Freshley used one of the contraband cellphones to intimidate witnesses during Vines' murder trial before Judge Friedrich in 19-CR-166 (DLF). This and other threats to witnesses made throughout the case led to a significant increase in security at the courthouse and substantial work on the part of law enforcement to ensure the safety of the witnesses.

Not only did the defendant's actions endanger the lives of his fellow detainees and obstruct justice, but he callously disregarded the well-known risks of fentanyl trafficking. It has been well documented that fentanyl is a highly potent substance, able to be lethal in doses as little as two milligrams. According to the CDC, synthetic opioids like fentanyl are the primary driver of overdose deaths in the United States. *See* DEA, Facts about Fentanyl (Comparison between 12 months-ending January 31, 2020, and the 12 months-ending January 31, 2021).[2] Despite the notoriety of the dangers of fentanyl, deaths from it remain incredibly high. Indeed, roughly 44,722 people in the United States died from overdose on synthetic opioids such as fentanyl in the 12-month period ending in February 2025. *See* CDC National Center for Health Statistics, *Provisional Drug Overdose Death Counts*.[3] This national crisis has inflicted particularly great harm upon the D.C. community: in 2023, D.C. had the second highest opioid mortality rate in the country, compared to the states. *See* KFF, *Opioid Overdose Death Rates and All Drug Overdose Death Rates per 100,000 Population (Age-Adjusted)* (2023 timeframe).[4] Despite the well-publicized fentanyl overdose epidemic, the defendant chose to disregard the risks and traffic fentanyl into a facility of particularly vulnerable people. As previously referenced, D.C. Jails are particularly vulnerable to drug abuse as an audit revealed that during the period of Robertson's offense the rate

---

[2] https://www.dea.gov/resources/facts-about-fentanyl.
[3] https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm.
[4] https://www.kff.org/other/state-indicator/opioid-overdose-death-rates.

of overdose deaths at the facilities were 10 times the national average at U.S. jails. Ex. 1. Accordingly, this factor favors a sentence at the top of the applicable guidelines range.

### B. The Need to Promote Respect for the Law and to Deter the Defendant and Others from This Type of Criminal Conduct

Between this case and his Voluntary Manslaughter conviction, Mr. Robertson has a significant sentence of incarceration ahead of him. Although he will not be at CDF and will serve his sentence at a Bureau of Prisons facility, the government and the Court have an interest in making sure his conduct from CDF does not carry over to the institution where he is designated to sentence. The threat of an additional significant sentence will deter Mr. Robertson from engaging in the type of behavior he did while awaiting trial in his homicide case.

Moreover, apart from Mr. Robertson, the smuggling of contraband into DOC facilities is a significant problem. There are at least three other active cases in this courthouse involving the smuggling of controlled substances into the jail. *See* 25-CR-213 (ABJ); 25-CR-87 (TSC); 24-CR-385 (TSC). CDF is an insulated environment where the Court's sentence will have a general deterrent effect. Detainees should know that smuggling dangerous contraband into a DOC facility will result in a significant sentence that will run *consecutive* to any offense that resulted in their detention in the first instance.

### C. The History and Circumstances of the Defendant

Mr. Robertson has a lengthy criminal history, spanning his entire adult life. Mr. Robertson has three convictions related to the possession or distribution of PCP. He also has a firearms conviction and a conviction. Beyond these more possessory offenses, Mr. Robertson has a history of significant violence. In 2017, Mr. Robertson was convicted of Assault and Possession of a Prohibited Weapon after stabbing a victim. *See* PSR ¶ 74.

His criminal history culminated in his arrest in December 2021. Mr. Robertson was charged in a homicide for beating a man to death as he lay motionless on the ground. *Id*. ¶ 75. Mr. Robertson is pending sentencing on that charge, but while that case was pending Mr. Robertson began the scheme to smuggle contraband into CDF.

This factor weighs heavily in favor of a sentence at the top of the applicable guidelines range.

### D. Unwarranted Sentencing Disparities

The District of Columbia Circuit has recognized that there will "inevitably . . . [be] sentencing disparities and inequities that can be explained by little more than the identities of the sentencing judges." *United States v. Gardellini*, 545 F.3d 1089, 1096 (D.C. Cir. 2008); *see also United States v. Saez*, 444 F.3d 15, 19 (1st Cir. 2006) ("[W]ith different judges sentencing two defendants quite differently, there is no more reason to think that the first one was right than the second."). The Guidelines "reduce unwarranted federal sentencing disparities," *Freeman v. United States*, 564 U.S. 522, 525 (2011), by "creat[ing] a comprehensive sentencing scheme in which those who commit crimes of similar severity under similar conditions receive similar sentences." *Id.* at 533.

A sentencing court "necessarily g[ives] significant weight and consideration to the need to avoid unwarranted disparities" by "correctly calculat[ing] and carefully review[ing] the Guidelines range." *Gall v. United States*, 552 U.S. 38, 54 (2007). "[I]mposing a within-guidelines sentence is the surest way to avoid unwarranted disparities." *United States v. White*, 737 F.3d 1121, 1145 (7th Cir. 2013).

According to the U.S. Sentencing Commission's Judiciary Sentencing Information, "there were 24 defendants whose primary guideline was §2D1.1 and Fentanyl was the primary drug type,

with a Final Offense Level of 15 and a Criminal History Category of V, after excluding defendants who received a §5K1.1 substantial assistance departure." PSR ¶ 168. All of those defendants received a sentence of imprisonment. For those defendants, "the average length of imprisonment imposed was 39 month(s) and the median length of imprisonment imposed was 38 month(s)." PSR ¶ 115.

Here, the government's recommended sentence, despite being above the average and median, is warranted. There were at least three smuggling incidents where the contraband was not recovered. That contraband, which the Court can infer included more controlled substances, would likely have driven the guidelines significantly higher. Additionally, the Court should consider that Mr. Robertson, who had already been convicted of stabbing a victim and who has now pleaded guilty to beating a man to death, attempted to smuggle in a large knife into CDF. Finally, Mr. Robertson, as the primary communicator with both conduits—Ms. Holland and Ms. Brown—was instrumental in orchestrating this schme.

**IV.     Pursuant 18 U.S.C. § 1791(c), Mr. Robertson's sentence should run consecutively.**

In this case, Mr. Robertson has been convicted of conspiring to smuggle, among other things, a Schedule II Narcotic into CDF, in violation of 18 U.S.C. § 371. Although Mr. Robertson was convicted of Conspiracy, the object of the conspiracy was to possess contraband in a prison, in violation of 18 U.S.C 1791(a)(2). Pursuant to 18 U.S.C. § 1791(c), "[a]ny punishment imposed . . . for a violation of this section by an inmate of a prison shall be consecutive to the sentence being served by such inmate at the time the inmate commits such violation." It is clear from the text of the statute that there was a legislative intent that inmates possessing contraband should be subject to *additional* penalties. There is little, if any, deterrent effect if an inmate is just sentenced to concurrent time to that which they are already serving. There would be no disincentive to

commit the crime. Here, although Mr. Robertson is convicted of conspiracy, a consecutive sentence serves the interests of sentencing and is consistent with Congressional intent for punishment of Mr. Robertson's actions.

## **CONCLUSION**

The Court should sentence Mr. Robertson to 46 months in prison to run consecutive with his other sentence.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY


 /s/ *Joshua Gold*
Joshua Gold
Tx Bar No. 24103101
Sarah Santiago
GA Bar No. 724304
Assistant United States Attorneys
United States Attorney's Office for D.C.
601 D Street NW,
Washington, D.C. 20530
E-mail: Joshua.Gold@usdoj.gov
Telephone: (202) 815-8965