**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**KIYA HOLLAND,**<br><br>**Defendant.** | **Crim. Case No. 24-CR-520-5 (TJK)** |

# UNITED STATES' MEMORANDUM IN AID OF SENTENCING

At least as early as February 2024 and continuing through July of that year, Kiya Holland packaged and delivered a knife, dangerous drugs including Fentanyl, and cellular phones to the Central Detention Facility ("CDF") for Darius Robertson, Marcel Vines, and Stefon Freshley as they awaited trial on charges including murder, kidnapping, and assault with intent to kill. This dangerous contraband can only make its way into CDF with the help of an individual in the community like Ms. Holland. An audit of the D.C. Jail during the period of Ms. Holland's offense found the rate of overdose deaths at the facilities to be 10 times the national average at U.S. jails. Ex. 1. During the audit period, there were also 76 incidents of contraband drugs recovered and Narcan was administered 148 times. *Id*. These numbers are shocking and underscore the seriousness of Ms. Holland's actions. Given the seriousness of this offense, and in consideration of the factors set forth in 18 U.S.C. § 3553(a), the Court should sentence her to 18 months incarceration, or the low-end of the applicable guidelines range as determined by the Court at sentencing.

## I. Background

Beginning by at least February 18, 2024—but likely much earlier—the Clay Terrace Detainees sought to bring dangerous contraband including weapons and controlled substances

into CDF. They recruited Correctional Officer Rashaad Roper and Ms. Holland to assist in bringing the contraband into the jail. On February 18, 2024, Mr. Robertson made a recorded jail call to Ms. Holland. The following conversation ensued:

**ROBERTSON**: You on your way?

**HOLLAND**: Yea, I'm about to leave out the house….too much…this is too much. Like this some greedy [expletives] right here.

**ROBERTSON**: I mean but it's two bowls though baby.

**HOLLAND**: It don't matter it's just that [Individual-1's] joint is like big as [expletive], like c'mon now what the [expletive].

**ROBERTSON**: I know baby.

**HOLLAND**: I's some greedy [expletive].

**ROBERTSON**: Yea…as long as it get through though baby.

**ROBERTSON**: You still remember them people don't you?

**HOLLAND**: What?

**ROBERTSON**: I said you still remember them people don't you?

**HOLLAND**: No.

**ROBERTSON**: Roper.

**HOLLAND**: Aight.

Shortly thereafter, Ms. Holland left a bag containing two Tupperware containers filled with contraband on a table at the staff entrance to CDF. About an hour later, Officer Roper went to the staff entrance and grabbed the bag left by Ms. Holland. Officer Roper took the Tupperware containers through the security screening room. Officer Roper placed the bag through the x-ray machine but there was no correctional officer monitoring the screen as the bag passed through. Officer Roper took the two Tupperware containers to the employee locker room, where he left

them for the night.

The next day, on February 19, 2024, Officer Roper went to his locker and transferred the contraband from the Tupperware to a white Styrofoam food container. He then brought the container into NW-1 and set the container on a pushcart with two large yellow and red coolers on it inside an empty hallway. Minutes later, the Clay Terrace Detainees entered the hallway, and Mr. Vines took possession of the container containing the contraband.







Mr. Vines then brought the food container into his jail cell, followed by Mr. Robertson and Mr. Freshley.

Officer Roper did not return to work until February 26, 2024. That day, Officer Roper

returned to the employee locker room. He retrieved the other Tupperware container and transferred contraband from that container into another white disposable food container. He then met with Mr. Vines inside a room near the NW-1 correctional officer security post.

Mr. Vines took the disposable food container containing contraband and walked with it into his assigned cell. Within seconds, Mr. Robertson entered Mr. Vines's cell. Mr. Robertson stayed with Mr. Vines for a few minutes, exited the cell, then met with Officer Roper, who escorted Mr. Robertson to a visiting room on the second floor. Waiting inside the room were two other detainees from the NW-3 housing unit. Mr. Robertson had no scheduled visit and no valid reason to be in the visitation room. Once Mr. Robertson left the visitation room, he walked unescorted with the two NW-3 detainees. While one of the detainees waited to enter NW-3, he can be seen on surveillance footage appearing to adjust something in his pants—presumably contraband given to him by Mr. Robertson.

On February 28, 2024, at approximately 10:56 a.m., Ms. Holland returned to CDF with another bag containing two Tupperware containers. She left the bag on the same table for Officer Roper. However, before Officer Roper could retrieve the containers for the Clay Terrace Detainees, the bag was intercepted by DOC Office of Investigative Services. Collectively, the containers contained: (1) one switchblade knife; (2) one Apple iPhone; (3) a white USB iPhone charger; (4) two pairs of eyeglasses; (5) a bundle of marijuana wrapped in clear saranwrap; (6) tobacco wrapped in clear saranwrap; (7) several sheets of white rolling papers; (8) a pair of gambling dice; (9) three white sheets of bonded paper that were damp and contained MDMB-4en-PINACA—a Schedule I Controlled Substance,; (10) two saran-wrapped packages of marijuana; and (11) five individually wrapped packages in clear saranwrap containing approximately 100 cigarettes. Officer Roper was placed on administrative leave.



With Officer Roper out of the unit and on administrative leave, Mr. Robertson and the other Clay Terrace Detainees sought to recruit a new officer to smuggle contraband into CDF. Four months later, they found their man in Officer Bryan Kinard. On June 30, 2024, July 7, 2024, and July 21, 2024, Officer Kinard obtained Tupperware containers filled with food from Ms. Holland or LaTara Brown outside the jail and brought them to Stefon Freshley inside CDF. Concealed inside the food was contraband. Each incident was captured on surveillance footage. Before each of these incidents, Mr. Robertson spoke to Ms. Holland via a recorded jail call to arrange the provision of the contraband. The July 21st incident was captured on Officer Kinard's body-worn camera. Officer Kinard can be seen on the July 21st video with audio: (1) describing to Mr. Robertson in detail the exact location of his vehicle so that Ms. Holland outside the jail could drop the contraband in Officer Kinard's vehicle; (2) providing his license plate number to the Clay Terrace Detainees so that Ms. Holland could drop the contraband in Officer Kinard's vehicle; (3)

coordinating with the Clay Terrace Detainees, including Mr. Robertson, as to when they would like him to take his break and obtain the contraband from his vehicle; and (4) providing the contraband to Mr. Vines and then Mr. Freshley and describing the "heavy" weight of the Tupperware container.

Two days after the July 21st smuggling incident, two photographs were posted from Mr. Freshley's known Instagram account, "___steflover" despite the fact that he was detained at CDF.[1] The first photograph was a picture of Mr. Vines and his co-defendant in the courtroom during jury selection of their murder trial before Judge Friedrich that had begun days earlier. The second photograph was a black screen overlayed with text, stating "It ain't going to be safe telling on them Boyz [emojis]."




[1] Of note, the profile picture for the "___steflover" account is a photograph of Freshley and Vines, which appears to have been taken inside the D.C. jail.

That post prompted significant new security measures at the courthouse. Additionally, it prompted law enforcement to review surveillance footage from the jail and eventually to identify Officer Kinard as the individual smuggling items in on behalf of the Clay Terrace Detainees.

On July 25, 2024, DOC conducted two searches of the Clay Terrace Detainee's unit for contraband. Inside NW-1, DOC staff found, among other things, approximately: (1) 269 blue pills (including 120 from Mr. Vines' cell), which tested positive for fentanyl; (2) 60 cigarettes soaked in an unknown liquid (including 40 in Mr. Vines' cell); (3) 255 suboxone strips (170 in Mr. Vines' cell); (4) 7 pieces of paper soaked in an unknown liquid substance; (5) three cellular phones; and (6) cigarettes.

## II. Sentencing Guidelines

The parties agree that the following guidelines apply.

| | |
|---|---|
| U.S.S.G. § 2D1.1(a)(5) (Cross-Reference from 2P1.2(c)) –<br>Base Offense – 8 to 16 grams of Fentanyl | 16 |
| U.S.S.G. § 2D1.1(b)(4)<br>Object of offense – distribution of a controlled substance in a prison | 2 |
| Acceptance of Responsibility | -3 |
| Total | 15 |

Ms. Holland has no prior criminal convictions, and accordingly, her Criminal History Category is to be I.

Based upon the Offense Level and the Criminal History Category set forth above, Ms. Holland's Sentencing Guidelines range is 18 months to 24 months. In addition, the parties agree that pursuant to U.S.S.G. § 5E1.2, should the Court impose a fine, at Guidelines level 15, the applicable fine range is $7,500 to $75,000.

### A. No Role Adjustment is Appropriate Pursuant to U.S.S.G. § 3B1.2 or § 2D1.1(e)(2)

Pursuant to the plea agreement, Ms. Holland reserved the right to argue for a mitigating role reduction of the guidelines pursuant to U.S.S.G. § 3B1.2. However, no such reduction is appropriate. In the context of this conspiracy, Ms. Holland's role was robust and indispensable. For the Clay Terrace Detainees to obtain contraband, they needed someone outside the jail to obtain the contraband, package it, conceal it in food, and deliver it to Officer Roper or Officer Kinard. Here, that was Ms. Holland. Put another way, the person who packages and conceals fentanyl, a knife, and other contraband among food and then delivers it to the D.C. Jail is not substantially less culpable than the other members of the conspiracy.

Ms. Holland will likely rely on U.S.S.G. § 2D1.1(e)(2) of the 2025 edition of the guidelines manual to argue that Ms. Holland served as a "courier" and should therefore receive a mitigating role adjustment. The Court should reject this argument. While it is true that Ms. Holland delivered drugs, calling her a courier significantly understates her role in the conspiracy. Although § 2D1.1 is the appropriate guideline section, the offense here cannot be directly analogized to a typical drug trafficking offense. This is not a conspiracy to distribute controlled substances, but rather a conspiracy to assist detainees obtain contraband. The person who acquires and delivers the contraband in such a conspiracy plays an elevated role and a role reduction is therefore inappropriate.

## III. The 18 U.S.C. § 3553(a) Factors

The Court must impose a sentence that is sufficient but not greater than necessary to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational treatment. 18 U.S.C. § 3553(a)(2). The Court also must consider the history and characteristics of the defendant, the kinds of sentences available, the

sentencing range under the guidelines, any relevant policy statements, and the need to avoid unwarranted sentencing disparities. 18 U.S.C. § 3553(a)(1)-(6).

Here, the severity of the offense supports a guideline sentence, but Ms. Holland's lack of criminal history and her positive contributions to her family and the community counsel in favor of a sentence at the bottom of the applicable guidelines.

**A. The Nature and Circumstances of the Offense and the Need for the Sentence to Reflect the Seriousness of the Offense**

Ms. Holland's offense was undoubtedly serious. Most shockingly, the evidence suggests that Ms. Holland packed a switch-blade knife to be sent into CDF, where individuals accused of violent crimes are intermingled with members of rival gangs, crews, and factions. Furthermore, she delivered controlled substances into an environment with a high population of individuals with substance-abuse problems. Additionally, while the phones smuggled into the jail may appear relatively innocuous, in this case, they were anything but. The evidence in this case suggests that Mr. Freshley used one of the contraband cellphones to intimidate witnesses during Vines' murder trial before Judge Friedrich in 19-CR-166 (DLF). This and other threats to witnesses made throughout the case led to a significant increase in security at the courthouse and substantial work on the part of law enforcement to ensure the safety of the witnesses.

Not only did Ms. Holland's actions endanger the lives of the detainees at CDF, but she disregarded the well-known risks of fentanyl trafficking. It has been well documented that fentanyl is a highly potent substance, able to be lethal in doses as little as two milligrams. According to the CDC, synthetic opioids like fentanyl are the primary driver of overdose deaths in the United States. *See* DEA, Facts about Fentanyl (Comparison between 12 months-ending January 31, 2020, and the 12 months-ending January 31, 2021).[2] Despite the notoriety of the dangers of fentanyl, deaths

[2] https://www.dea.gov/resources/facts-about-fentanyl.

from it remain incredibly high. Indeed, roughly 44,722 people in the United States died from overdose on synthetic opioids such as fentanyl in the 12-month period ending in February 2025. *See* CDC National Center for Health Statistics, *Provisional Drug Overdose Death Counts*.[3] This national crisis has inflicted particularly great harm upon the D.C. community: in 2023, D.C. had the second highest opioid mortality rate in the country, compared to the states. *See* KFF, *Opioid Overdose Death Rates and All Drug Overdose Death Rates per 100,000 Population (Age-Adjusted)* (2023 timeframe).[4] Despite the well-publicized fentanyl overdose epidemic, the defendant chose to disregard the risks and traffic fentanyl into a facility of particularly vulnerable people. As previously referenced, D.C. Jails are particularly vulnerable to drug abuse as an audit revealed that during the period of Vines' offense the rate of overdose deaths at the facilities were 10 times the national average at U.S. jails. Ex. 1. Accordingly, this factor favors a sentence at the top of the applicable guidelines range.

**B. The Need to Promote Respect for the Law and to Deter the Defendant and Others from This Type of Criminal Conduct**

There's little in Ms. Holland's background suggesting that she is a high risk to reoffend. However, Ms. Holland is one of a growing number of associates of DOC detainees who assist the detainee in obtaining contraband. *See United States v. Porter.*, 25-CR-59; *United States v. Bell*, 25-MJ-106; *United States v. Lewis*, 24-CR-385. The goals of general deterrence are served by a guidelines sentence in this case, which will indicate to associates of detainees inside DOC facilities that this type of conduct will carry significant consequences.

---

[3] https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm.
[4] https://www.kff.org/other/state-indicator/opioid-overdose-death-rates.

**C. The History and Circumstances of the Defendant**

At 34 years old, Ms. Holland has no prior criminal convictions. She has been a productive member of the workforce and is a supportive mother to three children. Ms. Holland accepted responsibility for her actions. Ultimately, this factor favors a sentence at the bottom of the guidelines range.

**D. Unwarranted Sentencing Disparities**

The District of Columbia Circuit has recognized that there will "inevitably . . . [be] sentencing disparities and inequities that can be explained by little more than the identities of the sentencing judges." United States v. Gardellini, 545 F.3d 1089, 1096 (D.C. Cir. 2008); see also United States v. Saez, 444 F.3d 15, 19 (1st Cir. 2006) ("[W]ith different judges sentencing two defendants quite differently, there is no more reason to think that the first one was right than the second."). The Guidelines "reduce unwarranted federal sentencing disparities," Freeman v. United States, 564 U.S. 522, 525 (2011), by "creat[ing] a comprehensive sentencing scheme in which those who commit crimes of similar severity under similar conditions receive similar sentences." Id. at 533.

A sentencing court "necessarily g[ives] significant weight and consideration to the need to avoid unwarranted disparities" by "correctly calculat[ing] and carefully review[ing] the Guidelines range." Gall v. United States, 552 U.S. 38, 54 (2007). "[I]mposing a within-guidelines sentence is the surest way to avoid unwarranted disparities." United States v. White, 737 F.3d 1121, 1145 (7th Cir. 2013).

According to the U.S. Sentencing Commission's Judiciary Sentencing Information, "there were 76 defendants whose primary guideline was §2D1.1 and Fentanyl was the primary drug type, with a Final Offense Level of 15 and a Criminal History Category of I, after excluding defendants

who received a §5K1.1 substantial assistance departure." PSR ¶ 124. 66 of those defendants received a sentence of imprisonment. For those defendants, "the average length of imprisonment imposed was 15 month(s) and the median length of imprisonment imposed was 13 month(s)." PSR ¶ 124.

Here, the government's recommended sentence, despite being slightly above the average and median, is warranted. There were at least three smuggling incidents where the contraband was not recovered. That contraband, which the Court can infer included more controlled substances, would likely have driven the guidelines significantly higher. These facts warrant the slightly higher sentence.

## CONCLUSION

The Court should sentence Ms. Holland to a sentence at the bottom of the applicable guidelines range as determined by the Court.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

/s/ *Joshua Gold*
Joshua Gold
Tx Bar No. 24103101
Sarah Santiago
GA Bar No. 724304
Assistant United States Attorneys
United States Attorney's Office for D.C.
601 D Street NW,
Washington, D.C. 20530
E-mail: Joshua.Gold@usdoj.gov
Telephone: (202) 815-8965